## DURHAM et al. v. SCRIVENER et al. (No. 6343.)

(Court of Civil Appeals of Texas. Austin. June 7, 1923. On Motions for Rehearing, July 2, 1923. Rehearing Denied Jan. 16, 1924. Writ of error granted March 5, 1924.)

1. Courts ⬠493(1)—Court first obtaining jurisdiction will retain it for determination of all issues.

By comity a court first obtaining jurisdiction will retain the exclusive jurisdiction for the determination of all issues involved in the suit.

2. Courts ⬠493(3)—State district court held to have lost jurisdiction only of all matters necessarily involved in suit pending in United States Supreme Court to determine state boundaries.

Where a suit in the United States Supreme Court was primarily to settle the boundary between Texas and Oklahoma, and that court

had not only original jurisdiction to try such issue, but, being the only court having such jurisdiction when that suit was filed, the district court lost jurisdiction as to all issues necessarily involved in that suit, or which might have been adjudicated under the pleadings in the case.

3. Courts ⬠500—Court of competent jurisdiction, not interfering with a receiver's possession, may proceed as if no receiver appointed.

A receiver has no title, but only temporary possession, and so long as it is not proposed to interfere with such possession, another court of competent jurisdiction may proceed in the same manner as if no such receiver had been appointed.

4. Abatement and revival ⬠9—Plea of abatement by ouster by suit in United States Supreme Court as to state boundary not sustained.

In a suit to cancel deeds alleged to have been procured by fraud, plea of abatement, based on contention that the district court was ousted of jurisdiction for all purposes by reason that the United States Supreme Court in a suit to determine the boundary line between Texas and Oklahoma appointed a receiver who took actual possession of the land embraced in the deeds sought to be canceled, not sustained, where the instant suit was one in personam and the receiver was not a party to it, and his possession would not be disturbed by cancellation of the deeds, whether the land was in Texas or Oklahoma.

5. Courts ⬠18—Location of land in Oklahoma would not prevent Texas court acquiring jurisdiction of persons from canceling deed procured by fraud.

The fact that land embraced in a deed sought to be canceled because of fraud is in Oklahoma would not prevent a court in Texas from canceling that deed, where the Texas court acquired jurisdiction of the person against whom the relief is sought.

6. Evidence ⬠122(8)—Evidence of plaintiff's impoverished condition held admissible as part of res gestæ, in suit to set aside deed for grossly inadequate price.

Where, in a suit to have a deed canceled, plaintiffs alleged defendants knew of coplaintiff's impoverished condition and took advantage of it to secure the conveyance for a grossly inadequate price, testimony by a coplaintiff as to what he told codefendant about plaintiff's financial straits held admissible, as being part of res gestæ of transaction in which defendants secured deeds of plaintiff.

7. Cancellation of instruments ⬠46—Evidence tending to show for whom codefendant acted as agent held admissible in suit to cancel deed for fraud.

In a suit to cancel deed because of fraud of codefendant D. in pretending to act as coplaintiff's agent, testimony tending to show codefendant D. was interested in conveyance by plaintiffs to codefendant C., or that he was acting as C.'s agent, held admissible.

---

⬠For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**8. Evidence ⊜113(1)—Proof of capitalization of oil companies held admissible to show value of leased lands conveyed to companies.**

In a suit to cancel a deed alleged to have been procured by defendant C. for a grossly inadequate consideration, proof of capitalization of codefendant companies to whom C. leased or sold the land *held* admissible to show value of lands conveyed by plaintiffs to C., where the capital stock consisted of leases on lands conveyed and by law required to be taken in exchange for stock at their actual value.

**9. Appeal and error ⊜1056(3)—Exclusion of testimony harmless, where, if admitted, it would not have proved fact.**

Exclusion of testimony *held* harmless, where, if it had been presented, it would not have shown the fact to establish which it was offered.

**10. Cancellation of instruments ⊜46—In suit to cancel deed procured by fraud, defendant held not entitled to show he was defrauded and still retain possession of land.**

In a suit to cancel a deed alleged to have been procured by fraud, *held*, that defendant should not have been permitted to show that he was defrauded in the transaction and at the same time retain possession of the land, since, if he was not satisfied with the title he obtained, he should have asked for a rescission of the contract.

**11. Contracts ⊜94(5)—Fraudulent representation constituting material factor in inducing making of contract, sufficient to set it aside.**

To avoid a contract for fraud or misrepresentation, it is not necessary that the fraud should have been the sole cause of making the contract, but it is sufficient if the fraudulent representation was relied on to the extent that it was a material factor in inducing the making of the contract.

**12. Deeds ⊜206—Evidence held not to show alleged fraudulent transfer was ratified.**

In suit to cancel deeds alleged to have been procured for a grossly inadequate price, failure to bring suit for several months after codefendant C. told coplaintiff W., two months after the transaction, that he (W.) had sold too cheap, *held* not to show ratification, where C. did not at that time know the real value of the land when it was sold, and plaintiffs did not learn of the real value until a short time before suit.

**13. Vendor and purchaser ⊜236—Associations holding legal title to lands without having paid value held not innocent purchasers.**

Codefendant holding associations, acquiring legal title to oil lands without having paid value therefor, *held* not innocent purchasers.

**14. Mines and minerals ⊜101—Associations holding oil lands and paying out stock dividends with notice of claim of original owner against stockholder held liable for such dividends.**

Where joint owners of oil land, in order to develop it expeditiously, and effect sales of leases thereof, conveyed the legal title of their respective interests to codefendant holding associations in trust, each owner to receive stock in proportion to his interest in the lands, *held* that, if codefendant associations paid to their respective stockholders proceeds of lease sales before notice that plaintiffs were claiming any interest in such lands by reason of an alleged void conveyance to codefendant C., who conveyed his interest to codefendant associations, plaintiffs were not entitled to judgment against the associations, but against codefendant C. for dividends he received on stock issued to him in return for the land purchased from plaintiffs, but if codefendant associations paid money to C. on his stock, representing the interest acquired from plaintiffs, after notice of latters' interest, or if they had funds received from lease sales to which C. would be entitled, plaintiffs would be entitled to judgment against the associations for such amounts.

**15. Tenancy in common ⊜22—Vendor and purchaser ⊜238—Purchaser from bona fide purchaser takes good title; oil company, to extent it was bona fide purchaser of interest in oil lease of plaintiff's interest in oil lands, held to be tenant in common with plaintiff.**

Where B. was an innocent purchaser of plaintiff's interest in an oil lease to the extent of the consideration paid by him, the B. Co., purchasing that interest from B., acquired title to the same extent, and to the extent that B. was an innocent purchaser the B. Co. became tenant in common with plaintiffs, and had the right to develop the oil therein at the joint expense of itself and plaintiffs, and was accountable to the latter for its pro rata of the oil, after deducting the reasonable expense incurred by it in procuring and marketing the same.

**16. Trusts ⊜354—Defrauded owners of land held to have right to ratify transaction and recover from defrauding purchaser amounts received from innocent purchasers.**

Whether or not purchasers of lands claiming title through defendants were innocent purchasers, *held*, that plaintiff owners could waive their right to rescind their conveyance to defendants, ratify their sale, and recover against defendant purchasers amounts paid to them by innocent purchasers.

**17. Evidence ⊜43(4)—Court takes judicial notice of pending suit in United States Supreme Court to determine boundary between Texas and Oklahoma.**

The appellate court will take judicial cognizance of a suit in the Supreme Court of the United States to determine the boundary between Texas and Oklahoma, and the judgment therein.

On Motions for Rehearing.

**18. Appeal and error ⊜1172(3)—Judgment may be affirmed or reversed in part on appeal, when issues are severable.**

Under rule 62a (149 S. W. x), judgment may be rendered on appeal, affirming the judgment of the trial court in part, and in part reversing and remanding the same, when the issues are severable.

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**19. Evidence ⟡⟞597—Testimony held sufficient to support verdict and judgment.**

Where, in a suit to cancel a deed, it devolved on plaintiffs to prove the amount of money received by codefendants in the sale of leases, testimony of codefendants' secretary, stating that he considered the approximate amount received as being $200,000, and testimony of stockholders that codefendants' officers had told him that $200,000 was the approximate amount received, *held* sufficient to sustain the verdict and judgment against codefendants, where the latter refused to produce their books, in violation of their agreement to do so, and the information sought was peculiarly within their knowledge.

**20. Trusts ⟡⟞354—Fraudulent purchaser of land, leasing part, held liable to defrauded owner for pro rata of proceeds.**

Where defendant, on obtaining a deed from plaintiffs by fraud, leased part of the land embraced therein, plaintiffs were entitled to recover their pro rata of the proceeds, without reference to state of plaintiffs' title to the land.

**21. Mines and minerals ⟡⟞81—Lessors without title not liable to owners for acts of lessees.**

If lessees of oil land, title to which does not belong in lessors, trespass thereon and extract oil therefrom, lessors are not liable to the owners.

**22. Trusts ⟡⟞354—Purchaser, procuring land by fraud and leasing it, held proceeds as trustee of defrauded owner.**

Where defendant purchaser procured land from plaintiff by fraud and leased it, he was liable as a trustee for the proceeds received from leases.

**23. Courts ⟡⟞493(3)—Issue of fact as to whether land was located in Texas or Oklahoma could be adjudicated only by United States Supreme Court, in which suit was pending to determine that issue.**

Where, in a suit to cancel a deed or in the alternative for damages for oil taken from land, a judgment was rendered for plaintiffs on the theory that the land was located in Texas, *held* that judgment must be reversed, where it appeared that the land was located in Oklahoma, and a suit was pending in the United States Supreme Court to determine that issue, since that issue could only be adjudicated by that court.

**24. Cancellation of instruments ⟡⟞46—Evidence to show vendors had no title held not admissible as defense in suit to cancel deed, but admissible as against claim for damages for taking oil from land.**

Though, in a suit to cancel a deed procured by fraud, evidence that plaintiffs had no title to the land embraced in the deed would not be admissible as a defense to cancel the deed, it would be admissible as against plaintiffs' claim for damages by reason of oil being taken from the land.

**25. Cancellation of instruments ⟡⟞57—Equity may adjust equities between innocent purchasers from fraudulent grantee and original owners.**

Where a party is an innocent purchaser to the extent of having paid a part of the purchase money without notice, a court of equity may adjust the equities between such purchasers and the true owner, either by allowing the owner to pay back the purchase money and recover land, or permit the purchaser to retain title to all of the land by paying the balance due to the owner, or may adjudge them to be tenants in common pro tanto.

Appeal from District Court, Travis County; Ireland Graves, Judge.

Suit by Charles P. Scrivener, in which W. B. Wortham intervened as coplaintiff, against R. L. Durham and others. From the judgment rendered, certain defendants appeal. Judgment affirmed in part, reversed in part, and remanded, with directions.

See, also, 228 S. W. 282.

C. L. Bass, of Wichita Falls, R. H. Ward, of Houston, W. D. Gordon, of Beaumont, and John W. Hornsby and N. A. Rector, both of Austin, for appellants.

H. S. Bonham and Dougherty & Dougherty, all of Beeville, and J. D. Moore, of Austin, for appellees.

JENKINS, J. On May 9, 1919, appellee Scrivener, for a consideration of $1,600 to him paid by W. M. Campbell, conveyed to Campbell his interest in the 621-acre B. F. Blount survey, 331-acre A. A. Durfee survey, and 640-acre Lucinda Meadows survey, and on the same day Scrivener and appellee Wortham, for the consideration of $3,400, conveyed to said Campbell their interest in an oil permit granted by the state of Texas to the Durfee school land survey. The interest claimed by Scrivener in the patented lands was an undivided one-fourth interest. Scrivener and Campbell claimed to own the oil permit.

On October 17, 1919, appellee Scrivener brought suit to cancel said transfers, on the ground that the same were obtained by fraud. Wortham intervened as coplaintiff, alleging that he was joint owner with Scrivener as to said lands and permit. The suit was brought against Durham and Campbell, upon the alleged ground that Durham was the attorney of appellees, and that he secretly acted as the agent of Campbell, and made fraudulent representations to appellees, with the knowledge and consent of Campbell, as to a material matter, whereby appellees were induced to transfer said property to Campbell for a grossly inadequate price. It is alleged that the other defendants were claiming an interest in said lands by purchase under Campbell, but that none of them were innocent purchasers; that

---

⟡⟞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

they sold or leased some of said lands to innocent purchasers. Appellees also prayed for general relief.

Appellants presented a plea in abatement, which was overruled. In addition to a general denial by all of the appellants, they pleaded ratification, and, with the exception of Durham and Campbell, they alleged that they were innocent purchasers. Clough and Lewis were made parties defendant, but as the judgment was in their favor, and no complaint is made to the same, that fact need not be further noticed.

### Findings of Fact.

The case was tried upon the following special issues:

"(1) Did the relation of attorney and client exist on the 9th day of May, 1919: (a) Between C. P. Scrivener and R. L. Durham? (b) Between W. B. Wortham and R. L. Durham? Answer (a) yes or no. Answer (b) yes or no.
"Answer: (a) Yes. (b) Yes.

"(2) Did W. M. Campbell, on the 9th day of May, 1919, know that R. L. Durham occupied such relation, if any, to C. P. Scrivener and W. B. Wortham? Answer yes or no.
"Answer: Yes.

"(3) Did C. P. Scrivener and W. B. Wortham, on said 9th day of May, 1919, actually repose trust and confidence in R. L. Durham in the negotiations in regard to the sale of their property? Answer yes or no.
"Answer: Yes.

"(4) Did W. M. Campbell and R. L. Durham expressly or impliedly agree, combine, confederate, or conspire together to secure the execution of the two deeds sought to be set aside in this suit from C. P. Scrivener and W. B. Wortham to W. M. Campbell wholly or in part through the said R. L. Durham? Answer yes or no.
"Answer: Yes.

"(5) If you have answered question No. 4 'Yes,' then answer: Were said two deeds secured wholly or in part by or through said R. L. Durham from C. P. Scrivener and W. B. Wortham in pursuance of such agreement, combination, confederacy, or conspiracy? Answer yes or no.
"Answer: Yes.

"(6) Did R. L. Durham aid in inducing or procuring said sale at or for an inadequate price on behalf of and with the assent of W. M. Campbell? Answer yes or no.
"Answer: Yes.

"(7) In the negotiations resulting in the execution of the two deeds sought to be set aside in this suit, did R. L. Durham act in good faith as an attorney, if he was such attorney, for C. P. Scrivener and W. B. Wortham? Answer yes or no.
"Answer: No.

"(8) If you have answered that R. L. Durham did not act in good faith in said transaction of May 9, 1919, then answer: Did said Campbell know or have good reason to believe that said R. L. Durham was not acting in good faith with said Scrivener and Wortham in such negotiations? Answer yes or no.
"Answer: Yes.

259 S.W.—39

"(9) Was Bass, trustee, a bona fide purchaser of the Scrivener interest in the lease to the extent of the consideration that was paid therefor in cash? Answer yes or no.
"Answer: No.

"(10) Was the Durfee Mineral Company Association a bona fide purchaser from W. M. Campbell to C. P. Scrivener's interest in the tract of land known as the A. A. Durfee patented survey? Answer yes or no.
"Answer: No.

"(11) State whether or not, at the time the defendant W. M. Campbell purchased the Scrivener and Wortham interests in the lands in controversy, as evidenced by two deeds executed by them on May 9, 1919, the cancellation of which is sought by the plaintiff, C. P. Scrivener, and intervener, W. B. Wortham, and in the consummation of said transactions, and in the negotiations of May 9, 1919, leading to the execution of said instruments, the said R. L. Durham was acting in the same as the agent or attorney for the defendant Campbell? The form of your answer to this question will be: He was, or he was not.
"Answer: He was.

"(12) State whether or not the defendant R. L. Durham, in the negotiations in the office of the intervener, W. B. Wortham, at the Capitol, made any material false and fraudulent representations to the intervener, W. B. Wortham, upon which the plaintiff, C. P. Scrivener, or W. B. Wortham relied, which induced them in whole or in part to execute the instruments of May 9, 1919, sought to be canceled in this suit? Answer yes or no.
"Answer: Yes.

"(13) If you answer question No. 12 in the affirmative, then state whether or not the defendant W. M. Campbell knew of such false representations or had good reason to believe that such false representations had been made? Answer yes or no.
"Answer: Yes.

"(14) Did the defendant W. M. Campbell, without the co-operation of R. L. Durham, negotiate the trade with W. B. Wortham which resulted in the execution of the instruments on May 9, 1919, sought to be canceled in this suit? Answer yes or no.
"Answer: No.

"(15) Did R. L. Durham in the negotiations resulting in the execution of said deeds of May 9, 1919, intentionally conceal from Wortham any material fact relating to the transaction with the view of inducing him to make the trade? Answer yes or no.
"Answer: Yes.

"(16) If you have answered the foregoing question in the affirmative, then state whether or not Campbell knew or had good reason to believe that Durham had made such concealment? Answer yes or no.
"Answer: Yes.

"(17) What was the reasonable market value on May 9, 1919, of plaintiff's interest in said A. A. Durfee survey?
"Answer: $55,166.

"(18) What was the reasonable market value on May 9, 1919, of C. P. Scrivener's interest in the mineral rights in said Durfee survey that were leased by Durfee Mineral Company to Bass?
"Answer: $45,000.

"(19) Was the Durfee Mineral Company (the foreign corporation) a bona fide purchaser of plaintiff Scrivener's interest conveyed to Campbell in the portion of the A. A. Durfee survey conveyed to it by the Durfee Mineral Company Association, by the deed acknowledged January 26, 1920? Answer yes or no.

"Answer: No.

"(20) What was the reasonable market value on May 9, 1919, of the portion of the A. A. Durfee survey so conveyed, referred to in the foregoing interrogatory?

"Answer: $373,500.

"(21) What was the reasonable market value of plaintiff's interest in the B. F. Blount survey on May 9, 1919?

"Answer: $15,722.

"(22) Bearing in mind the foregoing definition of a 'bona fide purchaser,' please answer: Was the Cordell Petroleum Company a bona fide purchaser of plaintiff's interest in the Lucinda Meadows survey, and the 50 acres of the A. A. Durfee survey, described in deed to it of date July 26, 1919, signed by W. M. Campbell? Answer yes or no.

"Answer: No.

"(23) What was the reasonable market value on May 9, 1919, of plaintiff's interest in said Lucinda Meadows survey, and in the 50 acres of the A. A. Durfee survey, referred to in the foregoing interrogatory?

"Answer: $168,534.

"(24) What was the reasonable market value on May 9, 1919, of Scrivener's interest in the portion of the lands conveyed by Cordell Petroleum Company pending the litigation over the Lucinda Meadows?

"Answer: $160,000.

"(25) Bearing in mind the above definition of 'bona fide purchaser,' state whether or not the Gypsy-Burk Oil Company (the name of which was subsequently changed to the Gypsy-Burk Production Company, etc.) was a bona fide purchaser of plaintiff's and intervener's interest in the 171-acre permit? Answer yes or no.

"Answer: No.

"(26) What was the reasonable market value of plaintiff's and intervener's interest in the mineral permit on May 9, 1919?

"Answer: $20,400.

"(27) What was the reasonable market value on May 9, 1919, of plaintiff's and intervener's interest in the portion thereof conveyed to Collins?

"Answer: $750.

"(28) Was Collins a bona fide purchaser thereof? Answer yes or no.

"Answer: Yes.

"(29) Was the Gypsy-Burk Petroleum Company of Texas a bona fide purchaser of the 161 acres of the permit conveyed to it by the Gypsy-Burk Production Company? Answer yes or no.

"Answer: No.

"(30) Was the Gypsy-Burk Petroleum Company of Delaware a bona fide purchaser from the Gypsy-Burk Petroleum of Texas, of the 161 acres referred to above? Answer yes or no.

"Answer: No.

"(31) What was the reasonable market value on May 9, 1919, of plaintiff's and intervener's interest in said 161 acres?

"Answer: $17,400."

The verdict of the jury in answer to all of said questions, except No. 9, is sustained by the evidence, and we here adopt such findings as our findings of fact.

The facts in the matter of the plea in abatement are set out in the judgment overruling said plea, and we here adopt the recitation of facts therein as our findings of fact in reference thereto. Said judgment is as follows:

"Now, on this the 6th day of May, 1920, came on to be heard the motion of defendants to abate this suit because the lands in controversy are now in the possession of a receiver appointed by the Supreme Court of the United States in a case therein pending, wherein the state of Oklahoma is complainant and the state of Texas is respondent, and wherein the United States is intervener, and many other persons are interveners therein. The facts with reference to which suit are as follows, and which facts are admitted to be true: That is, that heretofore the state of Oklahoma, claiming sovereignty over the lands in controversy in this suit and other lands, and also claiming proprietary ownership of said lands, instituted said suit prior to March 1, 1920, in the United States Supreme Court against the state of Texas, and thereafter, the state of Texas having answered in said suit, the United States intervened in said suit, claiming some of the lands therein involved, and also involved in this suit, as trustee for certain Indians, and also claiming proprietary ownership in other portions thereof, and certain placer claimants, claiming interest in the lands involved in this suit by virtue of the location of placer claims thereon under the mining laws of the United States, also intervened in said suit, and that on the 1st day of April, 1920, a petition for receivership was filed therein on the part of the United States, which was submitted to said court on said date and taken under advisement until the 4th day of April, 1920, when the court appointed a receiver to take charge of all the properties involved in this suit and other properties involved in that suit, who failed to qualify as such, and thereupon another receiver, having been appointed on the 13th day of April, 1920, thereafter took into his actual possession on the 24th day of April, 1920, all the lands involved in this suit, together with other lands and together with all personal property situated on the lands involved in this suit, and now holds the same in his actual possession, all of which facts are found by the court to be true, notwithstanding which the court is of the opinion that said motion should be overruled. It is therefore considered by the court refused, and the same is hereby denied and overruled, to which the defendants, in open court, then and there excepted."

Such additional matters with reference to the pleadings of the parties and the evidence as are necessary to the disposition of the case will be set forth in the opinion herein.

## Opinion.

The record in this case is voluminous. Appellants presented 152 alleged errors in their motion for a new trial, which they

have grouped under 88 assignments of error. We shall not attempt to discuss these assignments seriatim. A number of them are repetitions, presenting the same point from different angles. Some of the assignments we think are so far wanting in merit as not to require specific reference thereto.

· [1, 2] Logically, the first issue for our determination is as to the jurisdiction of the district court, which is challenged by the plea in abatement. It is a general rule of comity between courts that the court first obtaining jurisdiction will retain exclusive jurisdiction for the determination of all issues involved in such suit. This is not peculiar as between federal and state courts, but applies with equal force as between all courts. This suit was instituted prior to the institution of the suit in the federal court. This fact alone, however, is not important, inasmuch as the issue involved in the case before the federal court was not one in which the district court of Travis county and the federal court had concurrent jurisdiction. The suit in the Supreme Court of the United States was primarily to settle the boundary between Texas and Oklahoma, and the Supreme Court of the United States had not only original jurisdiction to try such issue, but it is the only court having such jurisdiction; consequently, when that suit was filed, the district court of Travis county lost jurisdiction as to all issues necessarily involved in that suit, or which might have been adjudicated under the pleadings in the case. Of course, the determination as to boundary would determine the issue of ownership as between parties claiming under Texas and those claiming under Oklahoma. The Supreme Court of the United States might have decided the issue of ownership as between parties claiming adversely to each other under title derived from the state of Texas, had such issue been presented by parties to the suit, or it might, as between such parties as to land found to be in Texas, if any, have remitted such parties to the Texas court for the adjudication of their rights. However this may have been, no such issue was presented in that court, and could not have been as to the appellees herein, for the reason that they were not parties to that suit.

[3, 4] It is contended by appellants that the district court of Travis county lost jurisdiction of this cause for all purposes, for the reason that, the Supreme Court of the United States having appointed a receiver, who had taken actual possession of the land involved including the wells and machinery thereon, the district court of Travis county was thereby ousted of all jurisdiction in the premises. We overrule this contention. It is true that when a court, through its receiver, has taken possession of the res involved, no other court has jurisdiction to enter a decree, the effect of which would be to interfere with such possession. A receiver has no title, but only temporary possession, and so long as it is not proposed to interfere with such possession, another court of competent jurisdiction may proceed in the same manner as if no such receiver had been appointed. Waterworks Co. v. Palestine, 91 Tex. 540, 44 S. W. 814, 40 L. R. A. 203; Ry. Co. v. State (Tex. Civ. App.) 155 S. W. 567; Calhoun v. Lanaux, 127 U. S. 634, 8 Sup. Ct. 1345, 32 L. Ed. 297; Buck v. Colbath, 70 U. S. (3 Wall.) 334, 18 L. Ed. 257; the Holladay Case (C. C.) 27 Fed. 843; 5 Thompson on Receivers, 6893–6896.

The possession of the receiver is the possession of the court appointing him. As illustrative of the doctrine that no other court will be permitted to interfere with such possession, we cite the following cases: Railway Co. v. Adelbert College, 208 U. S. 54, 28 Sup. Ct. 182, 52 L. Ed. 386, where it was sought to establish a lien against property in the hands of a receiver, the effect of which would have been to entitle the purchaser under a sale foreclosing such lien to a writ of possession; or where an attempt is made to foreclose an attachment, Railway Co. v. Lewis, 81 Tex. 1, 16 S. W. 647, 26 Am. St. Rep. 776; or to subject the property to a writ of garnishment, Reisner v. Railway Co., 89 Tex. 656, 36 S. W. 53, 33 L. R. A. 171, 59 Am. St. Rep. 84; or to levy an execution upon the property, Ellis v. Waterworks Co., 86 Tex. 115, 23 S. W. 858; or where a receiver is appointed in a bankruptcy case, whose duty it is to distribute the assets, Murphy v. Hoffman, 211 U. S. 569, 29 Sup. Ct. 154, 53 L. Ed. 327; or where the object of a suit is to dissolve a corporation and distribute the assets. In all such cases, judgment by another court would affect the possession of the receiver, and for that reason would not be permitted. This is a suit in personam, its object being to cancel deeds alleged to have been procured by fraud. No writ of possession is sought, and none was awarded in the judgment herein. No judgment is asked against the receiver. He is not a party to this proceeding. The cancellation of the deed executed by appellees would not interfere with the receiver's possession, whether the land be in Texas or in Oklahoma.

[5] The fact that the land is in Oklahoma, if such be a fact, would not prevent a court in Texas from canceling a deed procured by fraud, where such court has acquired jurisdiction of the person against whom such relief is sought. Massie v. Watts, 6 Cranch, 156, 3 L. Ed. 185. In the above-entitled case, after citing the cases of Penn v. Lord Baltimore, 1 Vesey Sr. 444, Arglasse v. Muschamp, 1 Vernon, 75, Earl of Kildare v. Sir Morrice Eustace and Fitzgerald, 1 Vern. 419, and Tollor v. Carteret, 2 Vern. 494, the court, speaking through Chief Justice Marshall, said:

"Upon the authority of these cases, and of others which are to be found in the books, as well as upon general principles, this court is of opinion that, in a case of fraud, of trust, or of contract, the jurisdiction of a court of chancery is sustainable wherever the ' person be found, although lands not within the jurisdiction of that court may be affected by the decree."

See, also, Morris v. Runnells, 12 Tex. 177; McQuerry v. Gilliland, 89 Ky. 434, 12 S. W. 1037, 7 L. R. A. 454; Hale v. Tyler (C. C.) 115 Fed. 839; Manley v. Carter, 7 Kan. App. 87, 52 Pac. 915; Texas Co. v. Central Fuel Oil Co., 194 Fed. 8,' 114 C. C. A. 21; W. U. Tel. Co. v. Ry. Co. (C. C.) 137 Fed. 437; White Star Min. Co. v. Hultberg, 220 Ill. 600, 77 N. E. 335; Sullivan v. Kenney, 148 Iowa, 361, 126 N. W. 349; Pillow v. King, 55 Ark. 639, 18 S. W. 765; Wilhite v. Skelton, 149 Fed. 72, 78 C. C. A. 635; Bevans v. Murray, 251 Ill. 625, 96 N. E. 554; Kinder v. Scharff, 125 La. 598, 51 South. 656; 2 Black on Rescission, § 656.

There are numerous assignments of error as to the admission of testimony, none of which we think present reversible error.

[6] In the second assignment complaint is made that Wortham was permitted to testify as to Scrivener's poverty. This evidence was not offered as a fact to influence the amount of recovery. Appellees alleged that Durham knew of Scrivener's impoverished condition, and took advantage of same to secure the conveyances from Scrivener for a grossly inadequate price. Wortham testified as to what he told Durham about Scrivener's financial straits.' This was a part of the res gestæ of the transaction in which Durham and Campbell secured the deeds from Scrivener.

[7] We think that the evidence as to Mrs. Townsend, by Durham and Campbell, with reference to her interest in the lands in controversy, was permissible as tending to show that Durham was interested in the conveyance by appellees to Campbell, or that he was acting as Campbell's agent, and that testimony in reference to the sale by Clough of his interest to Campbell was admissible for the same purpose. Loftus v. Sturgis (Tex. Civ. App.) 167 S. W. 14; Smitheal v. Smith, 10 Tex. Civ. App. 446, 31 S. W. 422; 12 C. J. 633.

[8] Proof of the .capitalization of the Durfee Mineral Company, the Cordell Petroleum Company, and the Gypsy-Burk Petroleum Company was admissible as tending to show the value of the lands conveyed by appellees to Campbell. The capital stock of these companies consisted of leases on those lands, and under the law of this state should have been taken in exchange for stock at their actual value.

[9, 10] There was no error in excluding the testimony offered to prove that Scrivener had no title to the lands conveyed by him to Campbell. The only effect of this testimony would have been to show that Scrivener committed a fraud upon Campbell by concealing from him facts which showed that he (Scrivener) had no title to the land that he conveyed. Had the offered testimony been admitted, it would not have shown such fact, and therefore its rejection was harmless. But, aside from this, Campbell should not have been permitted to show that he was defrauded in the transaction, and at the same time retain possession of the land. If he was not satisfied with the title he obtained, he should have asked for a rescission of the contract. Instead of doing so, he resisted such rescission. Blair v. Baird, 43 Tex. Civ. App. 134, 94 S. W. 116; Paschal v. Hudson (Tex. Civ. App.) 169 S. W. 911; De Perez v. Everett, 73 Tex. 431, 11 S. W. 388; Chaney v. Coleman, 77 Tex. 102, 13 S. W. 850.

We do not find reversible error in the charges given by the court, nor as to charges refused. Some of the issues submitted are not as full as they might have been, but they contain no affirmative error, and no additional matter in reference thereto was requested by appellants.

[11] Among other issues given which are assailed by appellants is that relating to fraud as the means whereby Durham and Campbell secured the deeds from Scrivener and Wortham.

Issue No. 4 reads as follows:

"Did W. M. Campbell and R. L. Durham expressly or impliedly agree, combine, confederate, or conspire together to secure the execution of the two deeds sought to be set aside in this suit from C. P. Scrivener and W. M. Wortham to W. M. Campbell wholly or in part through the said R. L. Durham?"

Issue No. 5 reads as follows:

"If you have answered question No. 4 'Yes,' then answer: Were said two deeds secured wholly or in part by or through said R. L. Durham from C. P. Scrivener and W. B. Wortham in pursuance of such agreement, combination, confederacy, or conspiracy?"

Appellants objected to issue No. 5, upon the ground that, in order to warrant rescission, appellees must have relied solely upon such false representations, and they requested a special issue to this effect, which the court refused. In this there was no error.

"It is not necessary, in order to avoid a contract on the ground of fraud, that such fraud should have been the sole cause of making the same. It is sufficient if the fraudulent representation is relied upon to the extent that it was a material factor in inducing the making of the contract, and without which the same would not have been made. Buchanan v. Burnett, 102 Tex. 495, 119 S. W. 1141, 132 Am. St. Rep. 900; Railway Co. v. Jowers, 110 S. W. 951; Railway Co. v. Shuford, 36 Tex. Civ. App. 251, 81 S. W. 1196, 1197; Hindman v. Bank, 112 Fed. 931, 50 C. C. A. 623, 57 L. R. A. 115; Tooker v. Alston, 159 Fed. 599, 86 C.

C. A. 425, 16 L. R. A. (N. S.) 822; Stackpole v. Hancock, 40 Fla. 362, 24 South. 914, 45 L. R. A. 821; James v. Crosthwait, 97 Ga. 673, 25 S. E. 754, 36 L. R. A. 633; Roberts v. French, 153 Mass. 60, 26 N. E. 416, 10 L. R. A. 657, 25 Am. St. Rep. 611; Bank v. Fletcher, 158 Mich. 162, 122 N. W. 540, 35 L. R. A. (N. S.) 862; 12 R. C. L. § 112, p. 358." Hart-Parr Co. v. Krizan & Maler (Tex. Civ. App.) 212 S. W. 837.

[12] It is contended by appellants that the court should have directed a verdict in their favor, for the reason that appellees ratified the contract by failure to bring suit for several months after they had discovered the falsity of the representations made by Durham. In support of this contention, they cite the fact that Clough told Wortham, in July, that he had sold too cheap. But Clough did not know at that time the real value of the land on May 9th, and neither he nor Wortham then knew that Durham had sent telegrams on May 7th to other parties interested in these lands, showing his knowledge as to their value. These telegrams, sent from Wichita Falls, are as follows:

"W. D. Gordon, Beaumont, Texas.

"United has six tho usand barrel well block 74. Everybody well. Will get abstract to Meadows this week. Adjoining land Meadows and Durfee selling two thousand dollars bonus. Can you come?

"[Signed] R. L. Durham."

"Mars McLean or W. D. Gordon, Beaumont, Texas.

"Meadows worth two thousand. Durfee Mineral three hundred no less. Have wired Clough accordingly.　　　[Signed] R. L. Durham."

He had not wired Clough "accordingly." Clough was authorized to sell Scrivener and Durham's interest in those surveys, and had wired Durham that he was offered $150 per acre for the Durfee Mineral; that is to say, for the permit. To this Clough replied by wire:

"Don't sell Durfee strip at one hundred and fifty. Worth more. Can get much better price. Will wire you definite offer to-morrow."

When Durham and Campbell called on Wortham at his office in Austin on May 9th, Wortham told Durham that Clough had wired that he had an offer of $150 per acre. Durham replied that Clough never closed anything, and that Campbell was ready to close and pay the cash, and advised Wortham to close with Campbell. On May 10, Clough sold his interest to Campbell at $150 per acre, Durham having brought them together at that time. Wortham testified that he thought, at the time the deed was made to Campbell, that he was selling too cheap; that is, for less than it was worth. A man needing money might be willing to sell land for less than its probable market value, but this is a very different thing from being induced by the fraudulent representations of his agent and attorney to sell for a grossly inadequate price. Scrivener and Wortham's interest in the Blount, Durfee, and Meadows surveys amounted to 199 acres. They sold same to Campbell for $1,600, or about $8 per acre. Wortham and Scrivener did not learn of these telegrams sent by Durham until a short time before the institution of this suit. The evidence did not show ratification.

[13] The jury found that neither the Durfee Mineral Association, nor the Durfee Mineral Company, nor the Cordell Petroleum Company, nor the Gypsy-Burk Petroleum Company were innocent purchasers. We approve these findings of fact. But it does not follow from this that appellees were entitled to the respective judgments which they recovered against these appellants. They were not innocent purchasers, because they paid nothing for the lands. The facts in reference to them are as follows:

[14] A number of parties owned undivided interests in these lands. A party buying for the purpose of development would not want an undivided interest. In order to avoid delays incident to dealing with a prospective buyer, all of the joint owners agreed to convey to these associations and corporations their different interests in these surveys, thus vesting in them the legal title, to be held, however, in trust for the respective owners, each of such owners receiving stock in such associations and corporations in proportion to their ownership in the lands. These associations and corporations thus became holding companies, having the legal title, but no beneficial interest. They sold leases on a portion of these lands to innocent purchasers. They alleged that they paid out all of the proceeds of such sale to their respective stockholders before they received any notice that appellees were claiming any interest in such lands. If this is true, appellees are not entitled to any money judgment against them, but would be entitled to judgment against Campbell for any dividends that he may have received on the stock issued to him by virtue of his alleged ownership under the conveyance to him by appellees. If either of these associations or corporations paid money to Campbell on his stock representing the interest which he acquired from appellees, after notice of appellees' interest, or if either of them have funds received from such sales, to which Campbell would be entitled as such stockholder, appellees are entitled to judgment against them for such amount.

The judgment against each of said associations and corporations is here reversed, with instructions to the trial court to ascertain what amount, if any, appellees are entitled to recover against said associations

and corporations, respectively, as herein indicated.

[15] Bass, trustee, purchased from the Durfee Mineral Company a lease on 249 acres of the Durfee survey, for which he paid $191,200, in cash, and agreed to pay $150,000, out of one-half of the production that he might get from said land, and one-eighth royalty. He has not paid any part of such $150,000, nor any royalty. We are of the opinion that the uncontradicted evidence shows that, to the extent of such cash payment, Bass, trustee, was an innocent purchaser. Such being the fact, the Bass Petroleum Company acquired title by its purchase from Bass, trustee, to the same extent that he held title. The Bass Petroleum Company, to the extent that Bass, trustee, was an innocent purchaser, became a tenant in common with appellees, and had the right to develop the oil therein at the joint expense of itself and appellees, and is accountable to appellees for its pro rata of said oil, after deducting the reasonable expense incurred by it in procuring and marketing the same. Oil Co. v. McKinney (Ky.) 221 S. W. 251.

[16] Appellants assign as error the finding of the jury that Collins, who purchased 10 acres of the Durfee Survey from Campbell and Durham, was an innocent purchaser, and in awarding appellees judgment for the value of the same. It is immaterial whether or not Collins was an innocent purchaser. As to him or any one else who purchased parts of the lands, appellees could waive their right to rescind, ratify the sale, and recover of Campbell and Durham the amount paid on such purchases.

[17] We take judicial cognizance of the suit in the Supreme Court of the United States to determine the boundary between Texas and Oklahoma, and the judgment therein. N. Y. Indians v. United States, 170 U. S. 32, 18 Sup. Ct. 531, 42 L. Ed. 938; Ohm v. San Francisco, 3 Cal. Unrep. 314, 25 Pac. 155; Conner v. State, 23 Tex. App. 384, 5 S. W. 189; 4 En. Ev. 882, 890. That court has decided that "the cut bank" on the south side of Red river is such boundary, and has appointed commissioners to mark the same. But we have no information, judicial or otherwise, as to how said boundary affects the land in controversy; that is to say, what part of such land, if any, is in Texas, and what part, if any, is in Oklahoma. When the trial court has ascertained this fact, it will adjudge appellees entitled to recover for the oil, if any taken from that part of the land in Texas; and if any part of such oil has been taken out by innocent purchasers, it will award judgment against Campbell and Durham for same for appellees' pro rata share thereof, unless appellees shall ratify such sale or sales, in which event they will be entitled to judgment against

Campbell and Durham for the money received by them from such sales.

The judgment herein is reversed, with instructions to the trial court to enter judgment canceling the conveyances from appellees to W. M. Campbell, and that appellees be reinvested with title, except in so far as the same has been sold to innocent purchasers, or in so far as appellees may elect to confirm any sale or sales of said land by Campbell or his assignees, to ascertain the facts necessary for the adjudication of the equities between all parties hereto, and to determine such equities and enter such judgment as law and equity may demand, as indicated in this opinion. If the evidence is the same upon another trial in reference to Bass, trustee, the court will find that he is an innocent purchaser.

Reversed and remanded, with instructions.

### On Motions for Rehearing.

As stated in our original opinion herein, the record in this case is voluminous. The transcript of the court proceedings contains 364 pages; the statement of facts 515 pages. The joint brief for appellants contains 221 pages; the separate brief of Bass, trustee, and Bass Petroleum Company, ——— pages; additional brief for appellees 35 pages, supplemental brief for appellees 47 pages, and citation of additional authorities by appellees, and written argument thereon, filed by permission of the court, 18 pages. The motion for rehearing by appellants contains 66 pages; the motion for rehearing by appellees contains 14 pages. Besides these, numerous motions were filed during the progress of the case in this court. The defendants are numerous, namely, R. L. Durham, W. M. Campbell, T. B. Lewis, George G. Clough, August E. Borsum, T. H. Bass, trustee, the Bass Petroleum Company, the Cordell Mineral Association, the Cordell Petroleum Company, the Durfee Mineral Association, the Durfee Mineral Company, the Gypsy-Burk Petroleum Company, a Texas corporation, and the Gypsy-Burk Petroleum Company, a foreign corporation.

The appellants made a common fight against appellees' cause of action in so far as it was sought to cancel the deed to W. M. Campbell, under whom they all claimed; but in addition thereto they made separate defenses. We mention these facts in extenuation, if not as a valid excuse, for the confusion and consequent error into which we fell in our opinion on motion for rehearing, in affirming the judgment of the trial court against the Durfee Mineral Company. This error was discovered by the writer hereof when he was called upon by the clerk of this court to advise him as to the proper form of judgment herein. The opinion heretofore rendered herein on motions for rehearing is withdrawn, upon this court's own motion, and

this opinion is substituted therefor. The motions for rehearing by the parties hereto are granted, and the judgment, entered in conformity to our original opinion, is set-aside, to the extent indicated in this opinion, but not otherwise. To the extent. that our original opinion herein is not modified by this opinion, the respective motions for a rehearing are overruled.

[18] Appellees insist that the judgment of the trial court, correcting the deed from them to Campbell, should be affirmed, instead of reversing the same, with instructions to the lower court to enter such judgment, for the reason that the evidence sustains the finding of the jury and the judgment of the court on this issue, and .that this issue is severable from other issues involved herein. We concede the correctness of this contention, and render judgment accordingly. Rule 62a (149 S. W. x) provides that, when the issues are severable, judgment may be rendered on appeal, affirming the judgment of the trial court in part, and in part reversing and remanding the same. This was the practice of appellate courts in this state before the adoption of said rule, and. has been consistently followed since. Wells v. Littlefield, 59 Tex. 556, 46 Am. Rep. 284; Schuster v. Bauman Jewelry Co., 79 Tex. 179, 15 S. W. 259, 23 Am. St. Rep. 327; Martinez v. Bruni (Tex. Com. App.) 235 S. W. 556; Needham v. Cooney. (Tex. Civ. App.) 173 S. W. 979; Johnson v. Conger (Tex. Civ. App.) 166 S. W. 407; Nona Mills Co. v.· Jackson (Tex. Civ. App.) 159 S. W. 932; Donada v. Power (Tex. Civ. App.) 186 S. W. 872; Oil Co. v. Oil Co., 106 Tex. 94, 157 S. W. 737, 51 L. R. A. (N. S.) 268. For a like reason, we also affirm the judgment of the trial court against R. L. Durham, W. M. Campbell, and the Cordell Petroleum Company, for $21,183.33, the same being appellees' proportion of the $200,000 received by said company for leases sold by it out of the lands conveyed by appellees to W. M. Campbell, after allowing an offset of $5,000 in favor of Campbell, for the purchase money paid by him to appellees.

[19] It devolved upon the appellees to prove what amount had been thus received by the Cordell Petroleum Company. This it sought to do by propounding interrogatories to W. D. Gordon, who testified that he was vice president of the Cordell Petroleum Company, a director thereof, and of counsel for said company in this cause. It was shown .that he was custodian of the books of the company. Mr. Gordon answered, among other things, as follows:

"In answer to the following question: 'Please kindly examine the books and records of the Cordell Petroleum Company, and state from said books and your own knowledge: (a) How many sales, leases, or releases of any nature whatever have been secured by the Cordell Petroleum Company since \ the 18th day of October, 1919, at 2 o'clock p. m.'—I will say that I have already indicated in preceding answers that I do not propose to go into the books and papers of the Cordell Petroleum Company or Durfee Mineral Company, or any other company in my charge, and turn over the information disclosed thereby to litigant parties in this suit, simply because they propound interrogatories seeking to obtain that information. I shall do nothing of the kind, unless in the course of the administration of justice, upon the proper showing, the court shall hold that it is my duty to do so, in which event I would respond willingly to the order of the court in this respect, but not otherwise. I make the same answer to all the subdivisions to this question, which are as follows: '(b) Give a concise, definite statement of each of the sales, leases, or releases, executed by the Cordell Petroleum Company since the 18th day of October, 1919, at 2 o'clock p. m., showing— (1) The acreage· involved in the transaction and the location thereof; (2) the name of the party to whom such sale, lease, or release was made or executed; (3) the amount of the consideration accruing to the Cordell Petroleum· Company by virtue of such transaction, and the nature of such consideration; that is, whether cash, notes, or whatever else such consideration may have consisted of.' "

When this cause was' called for trial in the district court, appellants sought a continuance. This was agreed to by appellees in consideration of the agreement of appellants that they would produce, at the next term of the court, such of the books of defendants as should be requested· by appellees; and appellees duly requested appellants to produce the books of the Cordell Petroleum Company. This they refused to do.

Geo. A. Smoot testified by deposition that he was secretary of the Cordell Petroleum Company; that he did not have the books of the company in his possession, but that he knew approximately the amount of money received by said company for leases, and that the same was about $200,000.· Mr. Clough, a stockholder in the Cordell Petroleum Company, testified that he talked with Mr. Barkley and Mr. Smoot with reference to the amount of money received by the Cordell Petroleum Company, and that "they told me something about what amount of money the Cordell Petroleum Company had on hand. I believe Mr. Smoot said approximately $200,000; that they had settlements with parties, and had received in those settlements some $200,000." Mr. Barkley was vice president of the company, and Mr. Smoot was its secretary. This testimony was sufficient to make a prima facie case that the Cordell Petroleum Company had received $200,000. If this was not correct, it could have shown by its books what amount it had received, and what amount, if any, it had paid out to its stockholders before receiving notice of the claim of the appellees herein. This information was peculiarly within the knowledge of the Cordell Petroleum Company. Having not only failed to produce its books, but flatly refusing to do so, in violation of its agree-

ment, the evidence adduced was sufficient to sustain the verdict of the jury in this regard, and to justify the court in rendering judgment against said company as hereinbefore stated.

[20, 21] The judgment against the Durfee Mineral Company rests upon grounds different from the judgment against the Cordell Company. The Cordell Company held title under the deed from appellees to Campbell. Under that title it leased a part of the land conveyed by said deed. That deed having been obtained by fraud, appellees were entitled to receive their pro rata of the money so received by the Cordell Company, without reference to the state of their title, or whether the land is in Texas or in Oklahoma. If it should subsequently be made to appear that some one else has title to said land, or a part thereof, such owner could not recover from the Cordell Company the money received for leases thereon. A sufficient answer to such claim would be:

"In executing such lease we committed no trespass on your land, and did not injure you. If our lessees have trespassed on your land and extracted oil therefrom, they are responsible to you therefor. The fact that they had a lease from us, who had no title, would be no defense."

[22] Presumably, but for the possession of the Cordell Company under the fraudulent deed to Campbell and their claim of title thereunder, appellees could have leased said land upon terms equally as advantageous as those executed by the Cordell Company. By reason of said deed having been obtained by fraud, the Cordell Company was a trustee for appellees.

[23] The judgment against the Durfee Company and Campbell, the Bass Petroleum Company and Durham, for $22,851 was entered, upon the finding of the jury that the Bass Petroleum Company, the lessee of the Durfee Company, had taken from the land so leased oil of the value of $225,000, and that the Bass Petroleum Company was not an innocent purchaser. Independent of the issue as to the Bass Petroleum Company being an innocent purchaser, this part of the judgment of the trial court must be reversed, for the reason that it appears from the record herein that all of the land leased by the Bass Petroleum Company is claimed to be in the state of Oklahoma. That this issue of fact can be adjudicated only by the Supreme Court of the United States, in which court a suit to determine that issue is now pending.

[24] If, upon another trial, it should be shown that the oil taken from the land leased by the Bass Petroleum Company was taken in whole or in part from land in Oklahoma, and the owners of such land should sue to recover the value of same. it would be no answer for the Bass Petroleum Company to say:

"We have paid for this oil under a judgment in favor of appellees herein."

A sufficient reply would be:

"Such parties had no title to the land; as I was not a party to that suit, it is in no wise binding upon me."

Under such circumstances, the judgment herein would not be admissible in evidence. The same is true, also, as to the Durfee Mineral Company and Durham and Campbell, if it should be shown, under proper pleadings upon another trial hereof, that the Durfee survey was embraced within the field notes of a prior patented survey, thus showing that appellees never had any title thereto. While such evidence was not permissible as a defense to appellees' suit to cancel the deed made by them to Campbell, being induced so to do by the fraudulent representations and concealments of Durham and Campbell, it will be admissible upon another trial hereof as against appellees' claim for damages by reason of oil being taken from said land.

The unavoidable length of our original opinion herein, as well as of this opinion, precludes a full discussion on our part of the errors complained of as to the admission and rejection of evidence, and the giving and refusal of charges. A careful re-examination of the record, in the light of the motions for rehearing, fails to convince us that we committed error as to any of these issues. For the reasons stated, the judgment of the trial court herein is affirmed, except as to the Bass Petroleum Company and the Durfee Mineral Company, and Durham and Campbell, for oil taken from the land, as to which appellants the judgment on this issue is reversed and remanded, with the following instructions:

[25] In our original opinion herein, we found that the undisputed evidence showed that Bass, trustee, was an innocent purchaser to the extent of the costs paid by him. We reaffirm this finding. Where a party is an innocent purchaser to the extent of having paid a part of the purchase money without notice, a court of equity may adjust the equities between such purchasers and the true owner, either by allowing such owner to pay back the purchase money so paid and recover the land, or permit the purchaser to retain title to all of the land by paying the balance due to the owner, or may adjudge them to be tenants in common pro tanto. There is no hard and fast rule as to this, but each case will depend upon its particular facts. 2 Pom. Eq. § 750; Durst v. Daugherty, 81 Tex. 650–654, 17 S. W. 388; Sparks v. Taylor, 99 Tex. 427, 90 S. W. 485, 6 L. R. A. (N. S.) 381.

We could not adjudge the Bass Petroleum Company and the appellees herein to be tenants in common pro tanto under the facts of record, for the reason that it is uncertain how much is or will be due by the Bass Com-

pany under its contract with the Durfee Company. That will depend upon how much oil it takes from land belonging to appellees. The trial court is instructed to adjust the equities between appellees and the Bass Petroleum Company in such manner as the evidence upon another trial will indicate will do justice to all of said parties.

The motions for rehearing are granted in part, and in part overruled, as indicated in this opinion.

Granted in part and overruled in part.